UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

     - v. -                                   :          S1 09 Cr. 723 (LAK)

JOSE MOSQUERA-PRADO,                        :
    a/k/a "El Negro,"
                                            :

           Defendant.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America

Benjamin A. Naftalis
John P. Cronan
    Assistant United States Attorneys
     - Of Counsel -

**Table of Contents**

I.    PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Background on the Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Evidence at Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.    Mosquera-Prado's Efforts to Use a Landing Strip at the Cabo Rojo Military Base in the Dominican Republic. . . . . . . . . . . . . . . . . . . . . . . . 3

        2.    The Seized Narcotics Shipments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            1.    The January 2009 Shipment of 19 Kilograms of Heroin. . . . . . . . . . 7

            2.    The February 2009 Shipment of 36 Kilograms of Cocaine. . . . . . . . 9

        3.    Mosquera-Prado's Additional Drug Dealing. . . . . . . . . . . . . . . . . . . . . 10

        4.    The Jury Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    C.    The Probation Department's Recommended Sentence. . . . . . . . . . . . . . . . . 13

III.  THE COURT SHOULD IMPOSE A SUBSTANTIAL TERM OF IMPRISONMENT. . . . . . . . . . . . . . . 14

    A.    Applicable Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.    Application of the United States Sentencing Guidelines. . . . . . . . . . . . . . . . . 16

        1.    Base Offense Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        2.    Two-Level Firearms Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        3.    Four-Level Leadership Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        4.    Resulting Advisory Guidelines Range. . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.      Seriousness of the Offense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D.      History and Characteristics of the Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E.      Need for Adequate Deterrence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

F.      Recommended Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23


IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# Table of Authorities

## Federal Cases

*Gall* v. *United States*, 552 U.S. 46 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States* v. *Beaulieau*, 959 F.2d 375 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Blount*, 291 F.3d 201 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Booker*, 543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States* v. *Duncan*, 42 F.3d 97 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Cavera*, 550 F.3d 180 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States* v. *Hertular*, 562 F.3d 433 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20

*United States* v. *Ortega*, 94 F.3d 764 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States* v. *Soto*, 959 F.2d 1181 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States* v. *Smith*, 215 F.3d 237 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States* v. *Stevens*, 985 F.2d 1175 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States* v. *Wisniewski*, 121 F.3d 54 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 24

*United States* v. *Zichettello*, 208 F.3d 72 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## Federal Statutes and Sentencing Guidelines

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 24

21 U.S.C. § 841. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

21 U.S.C. § 960. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

21 U.S.C. § 963. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

U.S.S.G. § 2D1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16, 17, 18

U.S.S.G. § 3B1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18, 19, 20, 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

      - v. -                              :          S1 09 Cr. 723 (LAK)

JOSE MOSQUERA-PRADO,                         :
        a/k/a "El Negro,"

                            :

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## I. Background

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Jose Mosquera-Prado, a/k/a "El Negro," ("Mosquera-Prado"), who was convicted after a two-week trial in October 2011 of conspiring to distribute one kilogram and more of heroin and five kilograms and more of cocaine, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A), and conspiring to import one kilogram and more of heroin and five kilograms and more of cocaine into the United States, in violation of Title 21, United States Code, Sections 963, 960(a), 960(b)(1)(A), and 960(b)(1)(B). Sentencing is scheduled for May 15, 2012.

As established at trial, Mosquera-Prado was one of the leaders of a Colombia-based drug trafficking organization whose mission was to ship tons of cocaine, as well as large quantities of heroin, around the globe, often with the narcotics having an ultimate destination of New York City. Mosquera-Prado, with access to airplanes that could transport huge amounts of his organization's cocaine, was responsible for arranging the aerial delivery of the narcotics. In this capacity, Mosquera-Prado assigned two of the drug trafficking organization's workers to scout a landing strip in the Dominican Republic that he believed would be used to receive planes loaded with cocaine, which then would be sent onwards to New York City. Mosquera-Prado additionally had contacts

with drug customers, and identified potential buyers in the United States for the organization's drug shipments.

Given the seriousness of this offense, including the massive quantities of cocaine that Mosquera-Prado's organization was looking to import into the United States and his leadership role in that organization, the history and characteristics of this defendant, the need for the sentence to create adequate deterrence to international drug traffickers, and the advisory Guidelines range of lifetime imprisonment, the Government believes that a substantial term of imprisonment is appropriate and necessary in this case. Probation recommends a sentence of 360 months' imprisonment. The Government respectfully submits that a substantial term of imprisonment, but below the advisory Guidelines range of life, would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.[1]

## II. BACKGROUND

### A. Background on the Charges

Co-defendant Francisco Gonzalez-Uribe, a/k/a "El Patron,"[2] was the leader of an international narcotics-trafficking organization that shipped thousands of kilograms of cocaine and heroin to various locations in Mexico, the Dominican Republic, Venezuela, and other countries. The drugs would be brought from these locations to the United States and various places in Europe.

---

[1]     The United States has made assurances to the Government of Colombia, from where the defendant was extradited, that it will not seek a term of life imprisonment.

[2]     Gonzalez-Uribe pled guilty on June 24, 2010, to conspiring to distribute and conspiring to import into the United States five kilograms and more of cocaine, and one kilogram and more of heroin. On November 30, 2010, Gonzalez-Uribe was sentenced to a term of imprisonment of 360 months.

Mosquera-Prado was one of Gonzalez-Uribe's partners, working closely with Gonzalez-Uribe to traffic huge quantities of narcotics into the United States for distribution and sale.

On December 15, 2009, Mosquera-Prado and six others, including Gonzalez-Uribe, were charged in a two-count indictment. Count One charged Mosquera-Prado with conspiring to distribute and possess with intent to distribute one kilogram and more of mixtures and substances containing a detectable amount of heroin and five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A). Count Two charged Mosquera-Prado with conspiring to import into the United States five kilograms and more of mixtures and substances containing a detectable amount of cocaine and one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Sections 963, 960(a)(1), and 960(b)(1)(A) and (B).

## B.     The Evidence at Trial

Trial in this matter commenced on October 4, 2011. The evidence at trial established that Mosquera-Prado was Gonzalez-Uribe's partner in their massive drug trafficking organization, bringing to table access to airplanes capable of transporting huge shipments of cocaine at a time. As partners, Gonzalez-Uribe and Mosquera-Prado worked together to figure out ways to send hundreds of kilograms of cocaine at a time, as well as a substantial amount of heroin, into the United States.

### 1.     Mosquera-Prado's Efforts to Use a Landing Strip at the Cabo Rojo Military Base in the Dominican Republic

In 2008, Mosquera-Prado was looking to find a way for his drug trafficking organization to send large quantities of cocaine into the United States. *See* Trial Transcript in *United States* v. *Mosquera-Prado*, S1 09 Cr. 723 (LAK) ("Tr."), Oct. 11, 2011, at 245. In the summer of that year,

Mosquera-Prado thought that he found a solution. An individual who went by the name "Sobrino" told Mosquera-Prado about a landing strip at a military base in the Dominican Republic. *See id.* at 245. Mosquera-Prado understood Sobrino to be a fellow narcotics trafficker; in actuality, however, Sobrino was a confidential source working with the Drug Enforcement Administration. *See id.* The plan was for Mosquera-Prado to send airplanes, filled with cocaine, to that military base. *See id.* Sobrino explained that he had contacts with corrupt Dominican military officials who would permit Mosquera-Prado to land his airplanes at the military base and would ensure that the drugs would not be intercepted. *See id.* Sobrino further told Mosquera-Prado that after his planes landed at the base, Sobrino would be able to handle transporting to the drugs to New York. *See id.*

Satisfied with this plan, Mosquera-Prado arranged for two of his workers to research this landing strip. First, toward the end of July 2008, Mosquera-Prado arranged for a man who went by the name, "Araña," to meet with Sobrino and examine the landing strip. *See* Tr., Oct. 4, 2011, at 36; Tr., Oct. 11, 2011, at 246. At a meeting with Sobrino and an undercover Special Agent of the DEA, who was posing as Sobrinio's New York City contact who would receive the drugs, Araña explained that he was responsible for assessing the landing strip for Mosquera-Prado's organization. *See* Tr., Oct. 4, 2011, at 36-37; Tr., Oct. 11, 2011, at 247. The next day, Sobrino and an undercover Dominican official, posing as a corrupt military official, showed Araña the landing strip located at the Cabo Rojo military base. *See* Tr., Oct. 4, 2011, at 37; Tr., Oct. 11, 2011, at 248-49. Upon arriving at the military base, Araña studied whether the landing strip would work for the Mosquera-Prado's organization. *See* Tr. Oct. 11, 2011, at 249. Satisfied with what he saw, Araña reported back to Colombia. *See id.* Soon after Araña's visit, Mosquera-Prado told Sobrino that everything sounded fine, and they began discussing the first shipment of cocaine. *See id.* at 249-50.

-4-

At around this time in 2008, Mosquera-Prado was forging his partnership with Gonzalez-Uribe, who was looking to get a piece of the action by joining Mosquera-Prado in sending drugs to the Dominican landing strip. *See* Tr., Oct. 11, 2011, at 250. Mosquera-Prado then arranged for Gonzalez-Uribe's associate, co-defendant Hector Fabio Ospina-Rosero, to travel to the Dominican Republic in late August 2008, to inspect the landing strip. *See id.*[3] In the days leading to Ospina-Rosero's travel to the Dominican Republic, Mosquera-Prado spoke with Sobrino to arrange the details of the trip. Mosquera-Prado explained that Ospina-Rosero had a visa that permitted him travel to the Dominican Republic, and emphasized the need for Ospina-Rosero to be careful when traveling to avoid being arrested. *See id.* at 251-53. Mosquera-Prado then arranged for Ospina-Rosero to contact Sobrino so they could work out the details of the trip themselves. *See id.* at 254-56; Tr., Oct. 13, 2011, at 547-58. Mosquera-Prado also coordinated with Gonzalez-Uribe over the telephone immediately before Ospina-Rosero's travel to the Dominican Republic, to further ensure that everything was set for the trip. *See* Tr., Oct. 13, 2011, at 551.

Ospina-Rosero traveled to the Dominican Republic the night of August 23, 2008. After Sobrino picked up Ospina-Rosero at the airport, Ospina-Rosero explained that Gonzalez-Uribe and Mosquera-Prado planned to send 2,000 kilograms of cocaine to the landing strip. *See* Tr., Oct. 11, 2011, at 261-62. Early the next morning, Ospina-Rosero, Sobrino, and the undercover Dominican official, again posing as a corrupt military official, drove to the Cabo Rojo military base. *See id.* at 263-64; Tr., Oct. 13, 2011, at 555-56. Much like Araña's trip the month before, the purpose of this trip was to show the base to Ospina-Rosero so he could report back to Gonzalez-Uribe and

---

[3]     Ospina-Rosero entered into a cooperation agreement with the Government and testified at trial. Both Ospina-Rosero and Sobrino testified about Ospina-Rosero's August 2008 trip to the Dominican Republic.

Mosquera-Prado. Once they arrived at the base, Ospina-Rosero surveyed the landing strip, was advised how the planes would land on the strip, and learned how the planes would refuel there. *See* Tr., Oct. 11, 2011, at 264; Tr., Oct. 13, 2011, at 556. Ospina-Rosero was satisfied with what he saw, and reported back to Gonzalez-Uribe later that day. *See* Tr., Oct. 13, 2011, at 557.

Mosquera-Prado closely monitored Ospina-Rosero's August 2008 trip. The evening of August 24, 2008, which was the day when Sobrino showed the base to Ospina-Rosero, Mosquera-Prado spoke on the telephone with Sobrino. *See* Tr., Oct. 11, 2011, at 263. During this call, Mosquera-Prado emphasized that he did not trust Ospina-Rosero and did not want him remaining in the Dominican Republic for too long. *See id.* at 266-68. Mosquera-Prado was concerned that Ospina-Rosero was too interested "in finding things out," that he was "overstepping himself," and that he would "get rid of us in the end." *See id.* at 267. In essence, Mosquera-Prado was worried that Ospina-Rosero was going to try to steal his drug business in the Dominican Republic, and he wanted Ospina-Rosero out of Santo Domingo and back in Colombia as soon as possible.

After Ospina-Rosero returned to Colombia, Mosquera-Prado arranged for a meeting in Medellin, Colombia, to discuss the landing strip. *See* Tr., Oct. 13, 2011, at 559-66. At this meeting, Ospina-Rosero reported back to Mosquera-Prado and Gonzalez-Uribe about what Sobrino had showed him in the Dominican Republic. *See id.* at 560. Ospina-Rosero described the landing strip in detail, explaining the lighting on the strip and the tank that would refuel the planes. *See id.* Satisfied with what he heard, Mosquera-Prado started talking about the first shipment to that landing strip, which was to be a 650 kilogram shipment of cocaine, of which 200 kilograms was to be sent to New York. *See id.* at 560-61. Mosquera-Prado had a particular plane in mind for this shipment – a King 300 – but he noted that they could use other planes, like a Grumman 2, in case they needed

to send more than 650 kilograms. *See id.* at 561. Mosquera-Prado also discussed his rate: he would charge $1,200 per kilogram of cocaine that he transported by plane. *See id.* at 566.

A couple of months later, in December 2008, Mosquera-Prado had a meeting at Gonzalez-Uribe's apartment to discuss this shipment. *See* Tr., Oct. 13, 2011, at 570-71. At this meeting, Mosquera-Prado, Gonzalez-Uribe, Ospina-Rosero, and the would-be pilot discussed the shipment, agreeing now to use a Grumman 2 airplane to send those 650 kilograms of cocaine and ensuring that the pilot was able to fly the plane. *See id.* Ospina-Rosero described the landing strip to the pilot, and they directed the pilot to keep his satellite phone off while in flight to avoid it being intercepted by law enforcement. *See id.* at 571.

### 2.     The Seized Narcotics Shipments

The Government offered evidence at trial of two intercepted drug shipments, both of which were directly tied to Mosquera-Prado. First, in January 2009, 16 bricks of heroin were intercepted in the Dominican Republic. Second, in February 2009, 36 of bricks of cocaine were delivered by members of the Mosquera-Prado's drug organization to Sobrino's supposed criminal associates in Barranquilla, Colombia. Both drugs load had an ultimate destination of New York City

### a.     The January 2009 Shipment of 19 Kilograms of Heroin

In January 2009, 16 bricks of heroin, weighing approximately 19.6 kilograms, were delivered to Sobrino's supposed associates in the Dominican Republic. *See* Tr., Oct. 11, 2011, at 292-93; Tr., Oct. 12, 2011, at 496-98; Tr., Oct. 13, 2011, at 502-06; *see also* Tr., Oct. 13, 2011, at 507 (stipulation regarding testing of sample of the seized heroin). One of the suppliers of this heroin, a drug trafficker who went by the name "Jota," was the person who introduced Sobrino to Mosquera-Prado. *See* Tr., Oct. 11, 2011, at 291. While not the supplier of the 16 bricks of heroin,

Mosquera-Prado nonetheless was intimately involved in this shipment. *See, e.g.*, Tr., Oct. 5, 2011, at 127-28 (testimony that, in early 2009, Mosquera-Prado was heard on Colombia wire intercepts discussing the 16 bricks of heroin).

Mosquera-Prado's role was to try to find customers for the heroin in the United States, and he had a number of potential buyers in mind. The first potential customer went by the name, "Papi La Moda." Mosquera-Prado gave Papi La Moda's contact information to Sobrino on January 7, 2009, and told Sobrino that Papi La Moda's people were willing to pay $48,000 per kilogram of the heroin, an increase of $1,000 from their initial offer. *See* Tr., Oct. 11, 2011, at 298-301, 303-05. Mosquera-Prado also explained that Papi La Moda, who was in the Dominican Republic, would fly to the United States to receive the heroin. *See id.* at 300-02.

Mosquera-Prado also told Sobrino that, before the deal could be finalized, Papi La Moda needed to inspect the quality of the heroin. *See* Tr., Oct. 10, 2011, at 304. Papi La Moda inspected the drugs on January 14, 2009, in a hotel room in Santo Domingo, where he met with Sobrino and an undercover DEA Special Agent, who was posing as one of Sobrino's criminal associates. *See id.* at 307-08. At this meeting, Papi La Moda complained that the color of the heroin was too dark and expressed concern that he would not be able to get a good price for the heroin in New York. *See id.* at 308. Following this meeting, Mosquera-Prado relayed Papi La Moda's concerns to Sobrino, and said that Papi La Moda wanted the drugs cheaper, for $45,000 per kilogram. *See id.* at 308-10.

After Papi La Moda did not end up buying the drugs, Mosquera-Prado continued to try to find a customer for the heroin. On January 17, 2009, just three days after Papi La Moda inspected the heroin, Mosquera-Prado sent Sobrino a New York City phone number for another potential

buyer.  *See id.* at 311-12.  Mosquera-Prado told Sobrino that, when calling this number, he should as

for "El Gordo."  *See id.* at 312.  Another potential buyer was someone named "El Ruso," whose

number Jota gave to Sobrino.  *See* Tr., Oct. 11, 2011, at 314.  El Ruso originally saw the heroin in

the Dominican Republic before it was sent up to New York, and then he saw the heroin again in

New York.  *See id.* at 314-15.  But when El Ruso later saw the drugs in New York, he complaining,

doubting that the heroin was the same substance he had seen in the Dominican Republic.  *See id.* at

315-18.  During a February 19, 2009 call with Mosquera-Prado, Sobrino called El Ruso and kept

Mosquera-Prado on the line so Mosquera-Prado could hear El Ruso's complaints himself.  *See id.* at

315-18; *see also id.* at 316-18 (El Ruso complaining that the heroin he saw in New York was "really

hard," while what he saw in the Dominican Republic was soft).

### b.    The February 2009 Shipment of 36 Kilograms of Cocaine

On February 4, 2009, Mosquera-Prado's organization delivered 36 bricks of cocaine,

weighing approximately 36 kilograms, to Sobrino's supposed criminal associates in Barranquilla,

Colombia.  *See* Tr., Oct. 5, 2011, at 129-134 (Detective Pineda of the Administrative Department of

Security in Colombia ("DAS") testifying to the seizure of 36 bricks of cocaine); Tr., Oct. 13, 2011,

at 507 (stipulation regarding testing of 36 bricks of cocaine).  This 36 kilogram shipment was part of

a larger a shipment of 300 kilograms of cocaine that was intended to be sent from Colombia to the

United States.  That shipment, which never ultimately arrived in Colombia, was supposed to contain

200 kilograms of cocaine from Gonzalez-Uribe and 100 kilograms of cocaine from Mosquera-

Prado. *See* Tr., Oct. 11, 2011, at 320-23; *see also* Tr., Oct. 5, 2011, at 129 (DAS Detective Pineda

testifying that, on the Colombian wire intercepts, "first they spoke about 600, later about 300, later

about 100, and finally about 36").  As Mosquera-Prado confirmed on a January 27, 2009 call, the

drugs were going to leave from Barranquilla, where Sobrino's people would load them onto boats, and the drugs eventually would arrive in New York. *See* Tr., Oct. 11, 2011, at 320-22. On a February 4, 2009 call, Mosquera-Prado asked Sobrino who had the 36 kilograms of cocaine – which he referred to as the "36 pesos" – and Sobrino confirmed that his people did. *See* Tr., Oct. 11, 2011, at 323-24. In addition, Mosquera-Prado was hoping to supplement additional drugs to this shipment. When Sobrino mentioned that his people were going to be loading the 36 kilos into vessels, Mosquera-Prado instructed Sobrino to wait so Mosquera-Prado could add some more drugs to that shipment. *See id.* at 324.

In addition, in a May 5, 2009 email to Sobrino, Mosquera-Prado expressed frustration that Sobrino had yet to sell the 36 kilograms of cocaine. *See* Tr., Oct. 11, 2011, at 334. Mosquera-Prado wrote, "You've had 36 for 4 months that you could have been working," expressing his desire that Sobrino sell the 36 kilograms of cocaine.

### 3. Mosquera-Prado's Additional Drug Dealing

Throughout the trial, an abundance of evidence was offered revealing the expansive scope of Mosquera-Prado's drug dealing. For instance, DAS Detective Pineda, who listened to Mosquera-Prado's phones for about a year and a half, testified that Mosquera-Prado and his criminal associates were constantly coordinating drug shipments and discussing their partners in the "second floor" and at "the twins" – code words used to refer to the United States and, more specifically, New York. *See* Tr., Oct 5, 2011, at 79-80, 86-96; *see also* Tr., Oct. 11, 2011, at 230-31 (Sobrino explaining meaning of code words); Tr., Oct. 13, 2011, at 541-42 (Opsina-Rosero explaining meaning of code words). Detective Pineda also heard Mosquera-Prado often talk about the slow approach – which

means sending drugs by boat – and the fast approach – which means transporting drugs by planes. *See* Tr., Oct. 5, 2011, at 86-91; *see also* Tr., Oct. 11, 2011, at 231; Tr., Oct. 13, 2011, at 541.

In addition, numerous calls and emails were introduced at trial, in which Mosquera-Prado discussed his drug dealing. Each of these calls and emails was entirely consistent with the testimony from Ospina-Rosero and Sobrino regarding the drug trafficking activities of Mosquera-Prado. These communications confirmed the close working relationship between Mosquera-Prado and Gonzalez-Uribe in the drug trade, as well as Mosquera-Prado's responsibility for the aerial movement of drugs. For example:

- In a September 30, 2008 email, Mosquera-Prado discussed a shipment of cocaine that he was working on with "The Gentleman," a reference to Gonzalez-Uribe. In this shipment, Gonzalez-Uribe was giving Mosquera-Prado 70 kilograms of cocaine on consignment. *See* Tr., Oct. 11, 2011, at 279-80.

- In an October 14, 2008 call, Mosquera-Prado told Sobrino that Gonzalez-Uribe had a job that required Mosquera-Prado to secure an airplane. Mosquera-Prado told Sobrino that "El Viejo," again referring to Gonzalez-Uribe, was motivated, referring to Gonzalez-Uribe's motivation to complete a large narcotics deal. Mosquera-Prado explained that Gonzalez-Uribe needed this plane for some of his associates who were looking to send a narcotics shipment. *See* Tr., Oct. 11, 2011, at 280-84.

- On November 3, 2008, approximately two or three weeks after the October 14, 2008 call, Mosquera-Prado revealed that he had located a plane for Gonzalez-Uribe. During this call, Mosquera-Prado advised that Gonzalez-Uribe's associates could do a test flight with the plane, but Gonzalez-Uribe explained that his contacts only

needed to look inside the plane, go in it, and turn on the engines.  *See* Tr., Oct. 5, 2011, at 121-24.

- In a November 15, 2008 email to Sobrino, Mosquera-Prado discussed his plans to deliver 500 kilograms of cocaine to the United States, referred to as the "second floor."  Of these 500 kilograms, 200 kilograms belonged to Gonzalez-Uribe ("the Gentleman") and 300 kilograms of cocaine would belong to Mosquera-Prado and Sobrino.  *See* Tr., Oct. 11, 2011, at 284-85.

- In a November 18, 2008 email that Mosquera-Prado sent to Sobrino, Mosquera-Prado explained that he planned to send 1,000 kilograms of cocaine to New York ("we'll send 1000 to the towers").  Of these 1,000 kilograms, Gonzalez-Uribe would sell 500 kilograms, and Mosquera-Prado and Sobrino would sell the other 500.  In this email, Mosquera-Prado emphasized the need to sell the drugs somewhere where they can get a good price.  That way, they would be able to turn a higher profit, which in turn would allow them to "work independently" – that is, do additional narcotics deals in the future.  *See* Tr., Oct. 11, 2011, at 285-86.

- On December 1, 2008, Mosquera-Prado sent an email in which he revealed that he was looking for a small plane to ship 700 kilograms of cocaine.  Mosquera-Prado explained that the flight would have a flight plan, thereby providing a cover to explain why the plane was traveling.  Mosquera-Prado also emphasized the urgency of this matter.  *See* Tr., Oct. 11, 2011, at 286-88.

- On December 15, 2008, Mosquera-Prado had a conversations with Gonzalez-Uribe discussing drug dealing and the quality of the cocaine.  In particular, Mosquera-Prado

emphasized the high quality of cocaine, noting that "the quality he's getting it's great" and that it is "a 9.8."

- On December 18, 2008, Mosquera-Prado sent Sobrino an email, which attached photographs and specifications of the plane, a Grumman, that Mosquera-Prado was looking to purchase with Gonzalez-Uribe. *See* Tr., Oct. 11, 2011, at 289-91. Notably, this was the type of plane that Mosquera-Prado said could carry 2,220 kilograms of cocaine at a time. *See* Tr., Oct. 13, 2011, at 565-66.

### 4. The Jury Verdict

On October 18, 2011, the jury returned a verdict finding Mosquera-Prado guilty of one count of conspiring to distribute controlled substances and one count of conspiring to import controlled substances into the United States. *See* Tr., Oct. 18, 2011, at 839. The jury found that both counts of conviction involved one kilogram and more of heroin and five kilograms and more of cocaine. *See id.* at 839-40.

### C. The Probation Department's Recommended Sentence

On May 8, 2012, the Probation Department provided a Presentence Investigation Report (the "PSI"). In the PSI, the Probation Department calculated a Guidelines range of lifetime imprisonment. *See* PSI ¶ 59. This sentencing range reflected a total offense level of 44, calculated as follows: a base offense level of 38, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1; a two-level increase for possession of a firearm during the course of the drug trafficking conspiracy, pursuant to U.S.S.G. § 2D1.1(b)(1); and a four-level increase because the defendant acted as a leader and organizer within an organization of five or more persons, pursuant to U.S.S.G. § 3B1.1(a). *See* PSI ¶¶ 33-44. The PSI further noted that, with no criminal history points,

Mosquera-Prado is in Criminal History Category I.  *See id.* ¶¶ 45-47.  The Probation Department recommended a sentence of 360 months' imprisonment.  (PSI, Sentencing Recommendation at 15).

### III.  THE COURT SHOULD IMPOSE A SUBSTANTIAL TERM OF IMPRISONMENT

**A.**     **Applicable Legal Standards**

Sentencing courts must engage in a three-step sentencing procedure.  *See United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  First, the district court must determine the applicable sentencing range, and, in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id.* at 112.  Second, the district court must consider whether a departure from that Guidelines range is appropriate. *Id.*  Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* at 113.

Although the Guidelines are no longer mandatory, district courts must continue to "consult" the Guidelines and "take them into account" when sentencing. *United States* v. *Booker*, 543 U.S. 220, 264 (2005); *accord United States* v. *Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) ("In [*Booker*], the Court retained an important role for the Sentencing Commission, leaving untouched the statutory direction to district courts that they should consult the Guidelines range when imposing sentence.") (citing *Booker*, 543 U.S. at 245-46).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 552 U.S. 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings, *id.* at 49, and must "remain cognizant of them throughout the sentencing process," *id.* at 50 n.6.  It also is the

Court's duty to form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant," and to then impose a sentence "sufficient, but not greater than necessary," to accomplish the objectives of criminal sentencing. 18 U.S.C. § 3553(a); *see Cavera*, 500 F.3d at 188 ("In addition to taking into account the Guidelines range, the district court must form its own view of 'the nature and circumstances of the offense and the history and characteristics of the defendant.'").

After performing the Guidelines calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B.      Application of the United States Sentencing Guidelines**

The Government agrees with the Probation Office's analysis with respect to the applicable Guidelines range for Mosquera-Prado.  Based on the calculation set forth below, the correct offense level is 44, yielding an advisory Guidelines range of lifetime imprisonment.

**1.      Base Offense Level**

First, the base offense level for the offense is found at U.S.S.G. § 2D1.1.  Mosquera-Prado conspired to distribute in the United States, and to import into the United States, massive amounts of both cocaine and heroin.  He was personally involved in two seized narcotics deliveries:  19 kilograms of heroin that were seized in the Dominican Republic in January 2009, and 36 kilograms of cocaine that were seized in Barranquilla, Colombia, in February 2009.  On top of that, Mosquera-Prado conspired with other members of his drug trafficking organization to transport hundreds of kilograms of cocaine, with an ultimate destination of New York.  Most notably, he directed two members of his drug trafficking organization to research a landing strip at the Cabo Rojo military base in the Dominican Republic, which Mosquera-Prado intended to have receive a King 300 airplane, loaded with 650 kilograms of cocaine, of which 200 kilograms would be sent onwards to New York City.

Clearly, the amount of narcotics that Mosquera-Prado conspired to distribute well exceeded the equivalent of 30,000 kilograms of marijuana, easily putting him at the top of the drug quantity chart contained at U.S.S.G. § 2D1.1(c).  Mosquera-Prado's base offense level therefore is 38.

**2.      Two-Level Firearms Enhancement**

The Court should apply a two-level increase to the Guidelines offense level, pursuant to U.S.S.G. § 2D1.1(b)(1), because firearms were possessed by participants of the drug conspiracy.

Guidelines Section 2D1.1(b)(1) requires a two-level increase in a defendant's offense level "[i]f a dangerous weapon (including a firearm) was possessed." Because "[t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons," possession of a dangerous weapon by the defendant, including constructive possession, is sufficient to warrant an enhancement "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, comment. (n.3).

The Second Circuit has stated that "[t]he defendant need not have had personal possession, or even actual knowledge of the weapon's presence; the enhancement is required 'so long as the possession of the firearm was reasonably foreseeable to the defendant.'" *United States* v. *Stevens*, 985 F.2d 1175, 1188 (2d Cir. 1993) (quoting *United States* v. *Soto*, 959 F.2d 1181, 1186 (2d Cir. 1992)). Further, the Second Circuit has elaborated that a defendant may be held responsible for possession of a firearm under Section 2D1.1(b)(1) if (1) the defendant "constructively possessed the weapon by having 'dominion . . . or control over the item itself, or dominion over the premises where the item [was] located'"; or (2) a co-conspirator's "'possession of the firearm was reasonably foreseeable to'" the defendant. *United States* v. *Ortega*, 94 F.3d 764, 768 (2d Cir. 1996) (citations omitted). Accordingly, "once the government has established that a weapon's presence was reasonably foreseeable to the defendant during conduct . . . relevant to the offense . . . at issue, the enhancement will apply . . . unless the defendant demonstrates that it is clearly improbable that the weapon was connected with the drug offense." *United States* v. *Smith*, 215 F.3d 237, 241 (2d Cir. 2000).

The Court should apply a two-level increase in this case because firearms were possessed by participants of the conspiracy in connection with the drug importation and drug distribution charges.

Specifically, during the January 2009 delivery of approximately 19 kilograms of heroin in the Dominican Republic, several individuals armed with semi-automatic rifles are clearly visible patrolling the parking lot where the narcotics transaction took place. Indeed, at points during the transaction, those individuals selling the drugs to the undercover law enforcement officers are visible interacting with those patrolling the area with semi-automatic rifles. Given that Mosquera-Prado was one of the leaders and organizers of the organization that supplied the heroin, *see infra* III.B.3, Mosquera-Prado himself worked to find customers for that heroin, and multiple armed guards patrolled the area when Mosquera-Prado's co-conspirators delivered the heroin, it is a natural inference that the possession of the firearms was reasonably foreseeable to Mosquera-Prado. Moreover, given the actual presence of these weapons, it cannot be said that "it is clearly improbable that the weapon[s] [were] connected with the offense." U.S.S.G. § 2D1.1, comment. (n.3); *see also Smith*, 215 F.3d at 241.

### 3. Four-Level Leadership Enhancement

An additional four-level enhancement is warranted, pursuant to U.S.S.G. § 3B1.1(a), because Mosquera-Prado served as a leader or organizer within this drug trafficking organization, which was comprised of five or more participants.

Section 3B1.1(a) of the Guidelines requires a district court to increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a); *see United States* v. *Hertular*, 562 F.3d 433, 448-49 (2d Cir. 2009) ("A defendant is properly considered as a manager or supervisor under § 3B1.1(b) if he 'exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or to supervise

lower-level participants.'") (quoting *United States* v. *Blount*, 291 F.3d 201, 217 (2d Cir. 2002)

(alterations, ellipsis, and internal quotation marks omitted)).  The adjustment applies as long as the

defendant "managed only one other participant"; it is not necessary for the defendant to have

managed five other participants.  *United States* v. *Zichettello*, 208 F.3d 72, 107 (2d Cir. 2000);

U.S.S.G. § 3B1.1, comment. (n.2).  Among the factors bearing on whether the enhancement is

warranted are "the degree of discretion exercised by [the defendant], the nature and degree of his

participation in planning or organizing the offense, and the degree of control and authority exercised

over the other members of the conspiracy."  *United States* v. *Beaulieau*, 959 F.2d 375, 379-80 (2d

Cir. 1992); *see also* U.S.S.G. §3B1.1, comment. (n.4) (in determining whether a defendant is a

leader or organizer, as opposed to a manger or supervisor, "[f]actors the court should consider

include the exercise of decision making authority, the nature of participation in the commission of

the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the

crime, the degree of participation in planning or organizing the offense, the nature and scope of the

illegal activity, and the degree of control and authority exercised over others").

Gonzalez-Uribe also was a leader in this drug trafficking organization.  Of course, however,

there can "be more than one person who qualifies as a leader or organizer of a criminal association

or conspiracy," U.S.S.G. § 3B1.1, comment. (n.4), because "one conspirator's leadership role is not

dispositive on the question of whether another was also a leader."  *United States* v. *Duncan*, 42 F.3d

97, 106 n.6 (2d Cir. 1994); *accord Hertular*, 562 F.3d at 449 (citation omitted).  A defendant may

qualify as a leader by organizing or leading some aspects of the offense even if others played more

prominent roles in other aspects.  *See United States* v. *Wisniewski*, 121 F.3d 54, 58 (2d Cir. 1997)

(co-conspirator's larger role in "day-to-day management" of money laundering operation did not

"foreclose a finding that [the defendant] was also a 'leader'"where he owned the auto dealership that laundered money and was primary beneficiary of crime).

Here, Mosquera-Prado qualifies as an organizer or leader, under U.S.S.G. §3B1.1(a). Among other things, in July 2009, Mosquera-Prado directed Araña to meet with Sobrino in the Dominican Republic for purposes of scouting the landing strip in the Dominican Republic to assess whether it would work for Mosquera-Prado's drug trafficking organization. Just one month later, Mosquera-Prado arranged for another member of the drug trafficking organization, Ospina-Rosero, to survey that same landing strip with Sobrino. Araña and Ospina-Rosero examined, for Mosquera-Prado, how planes would land at the base, how the drugs would be unloaded from the planes, and how the planes would refuel at the base. After viewing the base, Araña called back to Colombia to report what he saw, and later Mosquera-Prado indicated to Sobrino that he was satisfied by what he had heard about the base. Similarly, after returning to Colombia, Ospina-Rosero attended a meeting in Medellin at which he briefed Mosquera-Prado on the Cabo Rojo landing strip. By directing both Araña and Ospina-Rosero to research the military base for purposes of receiving planes filled with narcotics and then having both these workers report back to him, Mosquera-Prado unquestionably "exercised some degree of control over others involved in the commission of the offense." *Hertular*, 562 F.3d at 448-49.

Mosquera-Prado's conduct at the meeting in Medellin after Ospina-Rosero returned from the Dominican Republic illustrated the leadership role he played within the organization. With Gonzalez-Uribe present, Ospina-Rosero briefed Mosquera-Prado about the military base, and Mosquera-Prado asked a number of follow up questions about the landing strip. At both the Medellin meeting and the December 2008 meeting at Gonzalez-Uribe's apartment in Cali,

Mosquera-Prado discussed the types of planes he intended to use to send the drugs to the Dominican Republic and he made clear that he was able to provide these planes.

Moreover, this organization clearly was composed of five or more participants. Gonzalez-Uribe and Mosquera-Prado were two of the leaders of the organization. Ospina-Rosero and Araña were two workers for the organization. Rigoberto Castro, who also testified at trial, was a member of the organization with contacts in New York City to receive the organization's drugs. Many other members of the organization were also mentioned at trial, including the pilot who would fly the planes loaded with cocaine to the Dominican Republic, the individuals who delivered the cocaine in Barranquilla, and the potential buyers of the heroin, Papi La Moda, El Gordo, and EL Ruso.

### 4.    Resulting Advisory Guidelines Range

The above Guidelines analysis yields a total offense level of 44. Because Mosquera-Prado has no known criminal history, he is within Criminal History Category I. The resulting advisory Guidelines range is a term of life imprisonment.

## C.    Seriousness of the Offense

For reasons discussed above, this was an extremely serious drug trafficking offense. Mosquera-Prado was a leader of a massive drug trafficking organization, conspiring with his associates to transport hundreds of kilograms of cocaine into the United States, so the drugs could be distributed in New York. He boasted having access to airplanes that could move tons of cocaine at a time. As such, Mosquera-Prado offered a way to securely transport narcotics internationally, which is vital to any international narcotics trafficking organization. And Mosquera-Prado's drug trafficking was not limited to cocaine, demonstrated by his efforts to send 19.6 kilograms of heroin

to buyers in New York City.  If successful in his efforts, Mosquera-Prado would have flooded the streets of New York City with dangerous narcotics.

**D.      History and Characteristics of the Defendant**

This defendant's characteristics further warrant a lengthy term of imprisonment.  In addition to being a leader of a drug trafficking organization that endeavored to import hundreds of kilograms of cocaine at a time into the United States, the trial evidence made clear that Mosquera-Prado worked constantly to traffic narcotics.  Numerous emails and telephone calls were introduced at trial in which Mosquera-Prado repeatedly talked about his drug trafficking efforts.  And as DAS Detective Pineda testified, Mosquera-Prado and his associates were constantly intercepted on the Colombia wires discussing their efforts to traffic narcotics.  *See* Tr., Oct 5, 2011, at 79-96.

Moreover, there was evidence that Mosquera-Prado made a physical threat to a potential witness against him, which evidence strongly weights against him.  One of the Government's cooperating witnesses, Ospina-Rosero, testified about a threat that Mosquera-Prado made to him, clearly aimed at intimidating Ospina-Rosera from cooperating with the Government and testifying against Mosquera-Prado at trial.  After Mosquera-Prado and Ospina-Rosero were arrested in Colombia, Ospina-Rosero spoke with Special Agents of the Drug Enforcement Administration. Mosquera-Prado then confronted Ospina-Rosero, telling Ospina-Rosero that "two DAS agents had told him that [Ospina-Rosero] was cooperating with the DEA." Tr., Oct. 13, 2011, at 579.  Ospina-Rosero further testified that Mosquera-Prado then unambiguously threatened his life:

> [Mosquera-Prado] said that any son of a bitch who talked about him here in the United States, even if he had to sell his soul to the devil, he would find him and kill him.

*Id.* at 580.

Mosquera-Prado again confronted Ospina-Rosero again before an April 2011 court appearance. Ospina-Rosero testified at trial:

> [Mosquera-Prado] told me that his attorney had given him all of the documents with my conversations with the DEA and the prosecutor's office, that all my information was there, and that everything that I had snitched would serve me no good, would do me no good.

*Id.*

## E.      Need for Adequate Deterrence

Finally, the sentence in this case needs to create adequate deterrence, both for this defendant and also for other individuals who may consider turning to international narcotics trafficking and importing drugs into the United States as a source of income. The trafficking of cocaine and heroin into the United States remains an enormous problem for our country that must be addressed aggressively. The presence of dangerous drugs like cocaine and heroin on our streets causes immeasurable harm to society. Moreover, international narcotics trafficking can be a highly lucrative enterprise, as one need not look farther than the posh lifestyle that Gonzalez-Uribe led in the Dominican Republic prior to his arrest. *See, e.g.*, Tr., Oct. 13, 2011, at 567 (Ospina-Rosero describing Gonzalez-Uribe's penthouse apartment, which was "located in a very exclusive place in Cali," Colombia). A substantial sentence must be imposed to deter others from joining the drug trade like Mosquera-Prado and his criminal associates.

## F.      Recommended Sentence

As noted above in *infra* II.B, the advisory Guidelines range in this case is lifetime imprisonment. Probation has recommended a sentenced of 360 months' imprisonment. The Government acknowledges that, under the particular facts of this case, sentencing Mosquera-Prado to prison for the remainder of his life would be greater than necessary to achieve the legitimate

purposes of sentencing in this case, particularly in light of the fact that Gonzalez-Uribe received a

sentence of 30 years' imprisonment.  While Gonzalez-Uribe (unlikely Mosquera-Prado) accepted

responsibility for his actions and therefore allowed the Government and the Court to conserve

resources, the Government also assesses Gonzalez-Uribe to have been a more significant narcotics

trafficker than Mosquera-Prado.[4]  In light of these considerations, and the Section 3553(a) factors

discussed above, the Government acknowledges that a sentence of life imprisonment would be

greater than necessary to comply with the purposes of sentencing, but submits that a substantial

sentence, like the sentence received by Gonzalez-Uribe, is of course warranted in this case.

---

[4]     The Government's concession that Gonzalez-Uribe was a more significant
narcotics trafficker than Mosquera-Prado of course is in no way inconsistent with its position that
a four-level leadership enhancement is warranted for Mosquera-Prado.  *See* U.S.S.G. § 3B.1.1,
comment. (n.4) (explaining that there can "be more than one person who qualifies as a leader or
organizer of a criminal association or conspiracy"); *Wisniewski*, 121 F.3d at 58 (co-conspirator's
larger role in "day-to-day management" of money laundering operation did not "foreclose a
finding that [the defendant] was also a 'leader'"where he owned the auto dealership that
laundered money and was primary beneficiary of crime).

# IV. Conclusion

For the reasons stated herein, the Court should sentence the defendant to a substantial term of imprisonment, but less than life, followed by a term of supervised release, and impose a mandatory special assessment of $200 and a fine of between $25,000 and $4 million.

Dated:  New York, New York
        May 8, 2012

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the United States of America


                            By:    _/s/ John P. Cronan_____
                                        JOHN P. CRONAN
                                        BENJAMIN A. NAFTALIS
                                        Assistant United States Attorneys
                                        (212) 637-2779/-2456